**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | Crim. No.: 6:17-cr-00426-JMC |
| | ) | |
| v. | ) | |
| | ) | |
| Ana Milena Barrero, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Defendant Ana Milena Barrero, proceeding *pro se*, filed this Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. (ECF No. 104.) Defendant alleges she is entitled to relief based on ineffective assistance of counsel (*id*. at 4, 5) and the insufficiency of evidence for conviction (*id*. at 7). In response, the Government filed a Motion for Summary Judgment asserting that Defendant could neither demonstrate her lawyer's ineffectiveness nor that the evidence to convict her was insufficient. (ECF No. 126.) Defendant filed a detailed Response. (ECF No. 141.) Upon review, the court **DENIES** Defendant's Motion to Vacate under § 2255 (ECF No. 104) and **GRANTS** the Government's Motion for Summary Judgment (ECF No. 126).

## I.     FACTS AND PROCEDURAL HISTORY

Defendant conspired with her former romantic partner and co-defendant Theodore Khleborod to sell, package, and mail opioid narcotics over the dark web to users across the country. The death of eighteen-year-old A.C. from a U-47700 overdose triggered an intricate federal investigation that eventually uncovered Defendant and Khleborod's operation. (ECF No. 122 at 10-13.) After her arrest, Defendant pleaded guilty to conspiracy to possess with intent to distribute U-47700, butyryl fentanyl, furanyl fentanyl, fentanyl, and hydrocodone, resulting in the death and serious bodily injury of others, in violation of 21 U.S.C. §§ 841(a), (b)(1)(C), and 846. (ECF No. 70 at 1-2.) At all times, Defendant was represented by Joshua Snow Kendrick ("Counsel"). A

1

lengthy sentencing hearing covered the scope of the conspiracy, the government's investigation, Defendant's statement to investigators, and testimony from numerous witnesses on her behalf. (ECF No. 122.)  The court then sentenced Defendant to 180 months of incarceration, followed by three years of supervised release.  (*See generally*, ECF Nos. 95; 122.)  Defendant's plea agreement waived her right to appeal or challenge her sentence through post-conviction proceedings, except for ineffective assistance of counsel, prosecutorial misconduct, or favorable changes in the law. (ECF No. 70 at 12.)  Defendant did not file an appeal.  She now brings several ineffective assistance claims in a timely § 2255 Motion. (ECF No. 104.)

The factual background is adopted from the Government's presentation at Defendant's sentencing hearing, which Defendant accepted without contest.[1]    (ECF No. 122 at 6-22.) Defendant also admitted the underlying facts of this conspiracy in a lengthy counseled statement to federal investigators, recounting in detail the history and nature of Khleborod's "dark web" drug trafficking operation and her role within it.[2]    (ECF Nos. 125; 126 at 2-4.)  Defendant met Khleborod while they studied at the University of South Carolina Upstate.  (ECF No. 81 at 3.)  As their relationship became romantic, she began to discover the vast, global scale of Khleborod's drug trafficking activities.  (*Id*. at 4.)  By May 2016, she was assisting him by packaging and distributing U-47700, fentanyl, and other drugs, which Khleborod sold to buyers directly through his "PeterTheGreat" dark web account.  (*Id*.; ECF No. 122 at 16, 19.)  Defendant's primary

---

[1] The factual basis for Defendant's guilty plea was also laid out in detail during her plea hearing, and Defendant affirmatively agreed with the facts as presented.  Because an official copy of the sentencing transcript can be found on the record, the court cites to the Government's factual background therein.

[2] The official report of Defendant's statement is filed under seal with the court (ECF No. 125) but is referenced throughout the Government's presentation during sentencing and its Motion for Summary Judgment (ECF No. 126).  The court cites to the portions of the statement made public within the Government's Motion.

responsibility in the scheme was to buy stealth materials, such as dollar-store "Veriquick" pregnancy tests, in which the drugs would be concealed before the pair packaged and mailed them to buyers across the country.  (*Id*. at 14; ECF No. 126 at 3.)

The conspiracy began to unravel when police in Oregon found a Veriquick pregnancy test, baggies containing U-47700, a parcel containing a Greenville, South Carolina return address, and a secret dark web access code at the scene of eighteen-year-old A.C.'s overdose death.  (ECF No. 122 at 7, 12.)  Though the significance of these items was not immediately clear, patterns linking her death to other overdoses began to emerge: A Veriquick pregnancy test and a package listing a Greenville return address, for instance, were found in the home of M.L., who died from an overdose in Minnesota.  (*Id*. at 8-9.)  His autopsy revealed fentanyl in his system at the time of his death.  (*Id*. at 9.)  Only a few days later, a Philadelphia man named H.T. was narrowly revived with Narcan after ingesting fentanyl.  (*Id*. at 9-10.)  He told police that the drugs had been shipped to him from a dark web account named PeterTheGreat.  (*Id*. at 10.)  Like in the other cases, H.T.'s parcel contained seemingly innocuous items in which the fentanyl came hidden.  (*Id*.)  Investigators were eventually able to link all three overdoses to drugs purchased from PetertheGreat, in part through A.C.'s cellphone data.  (ECF No. 126 at 18 (referencing the Government's statement during the plea hearing that internet traffic from A.C.'s cell phone helped pinpoint the account).)  Agents tracked the South Carolina return addresses and conducted undercover dark web buys from PetertheGreat—at last identifying Khleborod as the man behind the account.  (ECF No. 122 at 11-13.)  Further investigation tracked the Veriquick pregnancy test found at the scene of A.C.'s death to a Dollar Tree in Greenville, South Carolina.  (*Id*. at 14.)  Upon reviewing security camera footage, agents were able to determine that a woman had purchased those tests in bulk around the time of A.C.'s death.  (*Id*.)  They recognized her as Defendant from

Khleborod's public relationship status on his Facebook account.   (*Id*. at 14-15.)  By this point, Defendant and Khleborod were under constant surveillance.  (*Id*. at 15.)  Agents intercepted 136 parcels containing U-47700, fentanyl, and other drugs which Defendant and Khleborod had attempted to mail over the next three days.  (*Id*.)  On April 26, 2017, agents arrested Defendant at Khleborod's Greenville apartment—recovering a bag full of parcels containing various drugs, packed and ready for shipping, from her possession.  (*Id*. at 16.)  Khleborod was arrested that day at work.  (*Id*.)  In the subsequent search of the apartment, agents discovered garbage bags with kilogram quantities of fentanyl, U-47700, and other illicit drugs.  (*Id*. at 17.)  Agents also found records of transactions and shipments between the PertertheGreat account and victims M.L. and H.T., matching the drugs, timeframes, and locales involved in their respective overdoses.  (*Id*. at 17-18.)

Approximately two months after her arrest, Defendant, in the presence of Counsel, gave a statement to federal investigators in which she acknowledged her role in the conspiracy.  (ECF No. 18-19.)  She provided testimony regarding the intricate details of the scheme, recalling drug shipments from Russia, China, and Spain, which she and Khleborod resold and mailed to buyers in multiple states.  (ECF No. 126 at 2-3.)  She expressed her familiarity with PetertheGreat and other dark web accounts used in the conspiracy.  (ECF No. 122 at 19.)  She recounted purchasing stealth materials, such as the Veriquick pregnancy tests discovered in the investigation, to conceal drug shipments.  (ECF No. 126 at 3.)  Importantly, she conceded that "she knew what she and Khleborod were doing was illegal."  (*Id*. at 4 (referencing sealed interview report).)

Defendant and Khleborod had, by all accounts, a volatile relationship—a fact counsel belabored in his sentencing memorandum (ECF No. 81) and during Defendant's sentencing hearing.  Khleborod controlled many aspects of Defendant's life.  (*Id*. at 4.)  His emotional abuse

left her depressed throughout their relationship; she even attempted suicide as an escape. (ECF No. 104-2 at 2.) While Counsel did not present evidence of physical abuse during sentencing, he emphasized how Khleborod had emotionally abused, threatened, and manipulated Defendant from the start. (*Id*. at 34-35.) Even after their arrests, for example, Khleborod attempted to thwart her cooperation in the investigation with manipulative letters and messages relayed through the prison grapevine. (ECF No. 122 at 36.) Counsel argued Defendant's involvement with Khleborod had changed her, and four close friends and family members provided testimony on behalf of Defendant, affirming this impression. (*Id*. at 32, 41-48.) They recounted how Khleborod's manipulation had essentially turned Defendant into "an accessory" in his scheme, (*id*. at 41), which she felt powerless to leave. One witness recalled a May 1, 2016, Facebook post around the time Defendant became involved in the conspiracy, where she stated simply, "I feel trapped." (*Id*. at 43-44.) Defendant's brother believed her participation in the conspiracy was driven by her decision to "do whatever [Khleborod] wanted to before caring about herself." (*Id*. at 47.) Defendant echoed these sentiments, profoundly regretful that she "made the mistake of holding on to someone who was so selfish." (*Id*. at 49.)

## II.    LEGAL STANDARD

### A. <u>Motion to Modify Sentence Pursuant to 28 U.S.C. § 2255</u>

Under 28 U.S.C. § 2255, a prisoner in federal custody may petition the court to vacate, set aside, or correct a sentence on the grounds that (1) the imposed sentence violates "the Constitution or the laws of the United States"; (2) the sentencing court lacked jurisdiction; (3) the sentence exceeded "the maximum authorized by law"; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A petitioner collaterally attacking his sentence or conviction pursuant to § 2255 bears the burden of proving his grounds for collateral attack by a preponderance

5

of the evidence." *White v. United States*, 352 F. Supp. 2d 684, 686 (E.D. Va. 2004) (citing Miller v. United States, 261 F.2d 546 (4th Cir. 1958)). "The language of § 2255 makes clear that not every alleged sentencing error can be corrected on collateral review." *United States v. Foote*, 784 F.3d 931, 932 (4th Cir. 2015). When the record conclusively shows that the petitioner is not entitled to relief, the court may dismiss the motion outright. 28 U.S.C. § 2255(b).

### B. Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Further, to show that a genuine issue of material fact exists, the non-moving party must set forth facts beyond "[t]he mere existence of a scintilla of evidence." *Id.* at 252. The non-moving party must present evidence sufficient to show a jury could reasonably return a verdict in its favor to avoid summary judgment. *See id.* at 248.

### III.    DISCUSSION

Defendant advances four distinct claims for ineffective assistance of counsel in her Motion (ECF No. 104 at 4, 6, 7) and Response to the Government's Motion for Summary Judgment (ECF

No. 141 at 20).  To establish ineffective assistance of counsel, Defendant must satisfy the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  She must first show that Counsel's performance was deficient.  *Id.* at 687.  Second, she must demonstrate "that the deficient performance prejudiced the defense."  *Id*.  The first *Strickland* prong requires the defendant to identify acts or omissions of counsel which "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. 688.  *Strickland* urges a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" without the benefit of hindsight.  *Id*.

The second *Strickland* prong requires Defendant to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  So, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal case if the error had no effect on the judgment.  *United States v. Morrison*, 449 U.S. 361, 364-65 (1981).  "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding."  *Strickland*, 466 U.S. at 691-92.  It is not enough for the defendant to show that the alleged errors had some plausible effect on the outcome of his case, because almost "every act or omission of counsel would meet that test."  *Id*. at 693.  Under *Strickland's* second prong, "the likelihood of a different result must be substantial, not just conceivable."  *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *id.*)  A defendant bringing an ineffective assistance of counsel claim after pleading guilty faces an even higher burden: she must show "that there is a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Defendant argues that Counsel's representation fell below this constitutional threshold, and

raises the following allegations of error: (1) failure to call a mental health expert to discuss Defendant's mental incompetence and inability to form the specific intent to participate in a conspiracy; (2) failure to contest Defendant's competency during her guilty plea and sentencing proceedings; (3) failure to investigate whether the drugs distributed through the conspiracy actually caused the victims' deaths;[3] (4) failure to appeal Defendant's conviction and sentence against her wishes.[4]

Before reaching these arguments, however, the court assesses Defendant's guilty plea in light of the record.

### A.  Validity of Guilty Plea

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill*, 474 U.S. at 56 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)); *see also Boykin v. Alabama*, 395 U.S. 238, 242 (1969).  Since it "operates as a waiver of important constitutional rights," a guilty plea must be "the voluntary expression of the defendant's own choice," entered "knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences" *Moussaoui*, 591 F.3d at 278 (quoting *Brady*, 397 U.S. at 748; *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005)) (internal marks omitted).

Courts must consider the "totality of the circumstances surrounding the guilty plea, granting the defendant's solemn declaration of guilt a presumption of truthfulness." *Walton*, 321

---

[3] Defendant initially argued there was insufficient evidence to sustain her conviction.  But in her Response to the Government's Motion for Summary Judgment, she re-styled her argument as an ineffective assistance of counsel claim, based on counsel's alleged failure to investigate the victims' deaths.  (ECF No. 141 at TK.)

[4] This claim was not mentioned in Defendant's original Motion and appears for the first time in Defendant's Response to the Government's Motion for Summary Judgment.  (*Id*.)

F.3d at 462 (internal citation omitted). "In the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should dismiss . . . any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005).

Reviewing the totality of the circumstances, the court concludes Defendant's guilty plea was voluntary, knowing, and intelligent. Though the guilty plea hearing was conducted together with four other defendants, collective questioning of multiple defendants satisfies the requirements of Rule 11. *See Hunt v. United States*, No. 3:06CV00471 W, 2007 WL 2898710, at *4 (W.D.N.C. Sept. 28, 2007) ("While not the preferred procedure, collective questioning of multiple defendants satisfies the requirements of Rule 11.") (citing *United States v. Hobson*, 686 F.2d 628, 629 (8th Cir. 1982); *United States v. Fels*, 599 F.2d 142, 145-46 (7th Cir. 1979)); *see also United States v. DeFusco*, 949 F.2d 114, 116 (4th Cir. 1991)) (affording "deference to the trial court's decision . . . how best to conduct the mandated colloquy with the defendant"). Defendant answered each question from the court under oath and remains bound by her statements. For instance, Defendant affirmed Counsel had discussed the charges and evidence against her, along with her constitutional rights and maximum punishments. She expressed satisfaction with counsel's representation and guidance. She stated she understood her right to plead not guilty and to be tried by a jury instead. When the court explained in detail the procedural trial rights forfeited upon pleading guilty, Defendant said she understood. Once the Government discussed the charges in each respective indictment, the court questioned each defendant individually on their understanding of the charges against them and their respective pleas. Defendant acknowledged her agreement. The court issued a specific warning to the defendants "involved in []conspiracy"—such as Defendant—explaining that their sentences could differ from their co-defendants' sentences based on each person's role,

criminal history, drug weight, and other considerations.  Defendant then indicated she was entering her plea freely, and declared that no other promises besides those in her plea agreement had been made to her.  The factual basis and details of each defendant's plea agreement were presented separately.  Addressing Defendant individually, the court ascertained she agreed with the presented facts before concluding she understood her rights, the charges, and the maximum punishment and accepting her guilty plea.  At all times, Defendant was counseled.  Defendant's plea complied with the requirements of Rule 11.  It was knowing, voluntary, and for that reason, valid.  The court turns now to Defendant's ineffective assistance claims.

## A. **Failure to Present Mental Health Expert**

Defendant contends that Counsel should have investigated certain defenses related to her alleged mental incompetence and inability to form an intent to participate in the conspiracy.  (ECF Nos. 104 at 4, 104-2 at 1-4.)  She claims Counsel's failure to call a mental health expert to testify to her depression, post-traumatic stress disorder ("PTSD"), addiction, suicide attempts, and abuse in Khleborod's hands and resulting "battered woman's syndrome," led her to plead guilty without fully understanding her available defenses.  (ECF No. 104-2 at 3-4.)  Counsel's actions, she alleges, rendered her plea involuntary.  Alongside her Motion, Defendant filed several medical records listing her mental health diagnoses.  (ECF No. 104-3.)  Even if Defendant can provide factual support for her claims, however, she faces a steep uphill battle.  *United States v. Timmreck,* 441 U.S. 780, 784 (1979).

A knowing and voluntary guilty plea generally waives all "independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."  So, a defendant may attack only the voluntary and intelligent nature of the guilty plea by proving "that the advice received from counsel was not within the range of competence demanded of attorneys

10

in criminal cases." *Blackledge v. Perry*, 417 U.S. 21, 29-30 (1974); *see also Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1294-96 (4th Cir. 1992).

But some exceptions allow courts to consider challenges to a guilty plea on post-conviction review. Notably, the Fourth Circuit clarified that courts may examine pre-plea attorney conduct to "the extent . . . the prior representation influenced the voluntary and intelligent character of the guilty plea entered." *Fields*, 956 F.2d at 1297 (citing *Tollett v. Henderson*, 411 U.S. 258, 266-67 (1973)). This is a subtle distinction. Prior constitutional violations are intertwined with challenges to counsel's performance because they "may play a part in evaluating the advice rendered by counsel." *Tollett,* 411 U.S. at 267. Still, such claims "are not themselves independent grounds for federal collateral relief." *Id.*; *see also United States v. Glover*, 8 F.4th 239, 245 (4th Cir. 2021), *cert. denied,* 142 S. Ct. 838 (2022) ("In addition to Rule 11 problems, ineffective assistance of counsel claims regarding an attorney's pre-plea conduct are also cognizable on appeal post-plea"); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013) (considering the merits of a defendant's ineffective assistance claims for counsel's failure to investigate certain defenses because they "relate[d] to [the defendant's] decision to plead guilty"); *Fugit*, 703 F.3d at 259-260 (rejecting the validity of an alleged defense on the merits and holding "it is [] reasonable for counsel not to advise clients of unmeritorious defenses.")

Defendant charges Counsel with failure to investigate several critical defenses and leading her to plead guilty when her conduct was legally excused or justified. Two separate claims emerge from Defendant's argument. First, Defendant appears to invoke an insanity defense by claiming that drug use, depression, and abuse left her incompetent and unable to form the required intent for conspiracy. (ECF No. 141 at 9.) Second, Defendant alludes to the defense of duress, explaining she "did as she was told and was forced to do," by Khleborod, who coerced her to purchase stealth

materials for him and mail his drugs.  (*Id*. at 2.)  On both grounds, she argues that her lawyer's failure to obtain a mental health evaluation needlessly drove her to plead guilty and deprived her of these defenses.

But the facts of this case, derived largely from Defendant's own words in her counseled statement to investigators, support neither a defense of insanity nor duress.  Because Counsel's failure to advance unfounded defenses could not have been ineffective, Defendant's argument fails.

### 1. Insanity

Defendant first asserts Counsel provided ineffective assistance because he failed to investigate a potential insanity defense arising from her alleged inability to form the required *mens rea*, or state of mind, to participate in the conspiracy.  (ECF No. 104-2 at 4.)  "[A]n attorney provides ineffective assistance if he or she does not pursue an insanity defense, but is aware of the possibility that the client was legally insane at the time he committed the offense and no other defense is available."  *Alexander v. United States*, No. 2:19CR5, 2020 WL 3397753, at *4 (E.D. Va. June 19, 2020), *appeal dismissed,* 858 Fed. App'x 638 (4th Cir. 2021) (citing *Hooper v. Garraghty*, 845 F.2d 471, 474 (4th Cir. 1988) (concluding the attorneys' conduct fell below minimum standards of competency because they failed to obtain a mental health evaluation despite clear indications it was necessary, leading the defendant to plead guilty "without the benefit of a psychiatric evaluation of his mental condition at the time he committed the crimes").

Defendant concedes her attorney knew about her mental health struggles, including relationship abuse and depression, and raised these issues before the court.  Both in the sentencing memorandum and sentencing hearing, Counsel discussed Defendant's tragic circumstances at length, including the threats and manipulation to which Khleborod had subjected her throughout

their relationship, how he "followed the familiar pattern of a classic domestic abuser," and how she had unsuccessfully tried to leave.  (ECF No. 81 at 5-6.)  Letters and live testimony from community members, friends, and family reiterated the idea that Defendant had fallen under Khleborod's dark influence.  (See ECF Nos. 81-1; ECF No. 122 at 41-48.)  Therefore, Defendant had the opportunity to present evidence of relationship abuse and mental health issues.

Under *Strickland*, Defendant can sustain her ineffective assistance claim only by showing (1) that a reasonable attorney would have obtained a mental health evaluation, and (2) a reasonable probability that, if Counsel had obtained such an evaluation, Defendant would have proceeded to trial.  *See Strickland*, 466 U.S. at 688-89; *Hill,* 474 U.S. at 59.  Defendant cannot meet this burden because the record does not support the viability of a legal insanity or mental incapacity argument which a reasonable attorney should have pursued.

Congress largely abolished the federal insanity defense with the Insanity Defense Reform Act ("IDRA"), 98 Stat. 2057 § 20 (1984), which "expressly prohibits the use of any '[m]ental disease or defect' as a defense unless it demonstrates that the defendant 'was unable to appreciate the nature and quality or the wrongfulness of his acts.'"[5]  *United States v. Worrell*, 313 F.3d 867, 872 (4th Cir. 2002).  Yet, *Worrell* permits evidence of mental disorders falling short of insanity to

---

[5] The IDRA codifies the federal insanity defense, stating:

> (a) Affirmative defense.  It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.  Mental disease or defect does not otherwise constitute a defense.

> (b) Burden of proof.  The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C.A. § 17 (West).

"negate one of the elements of the government's case," rather than "justify[] defendant's conduct" or bring "an affirmative defense or legal excuse." *Id*. at 872-73. For that reason, defendants can present psychiatric evidence to illuminate their state of mind at the time of the offense and undermine the prosecution's proof of *mens rea*. *Id*. Still, the Fourth Circuit foresaw few "scenarios in which a defendant could introduce psychiatric evidence, short of insanity, that was not simply diminished capacity evidence or some other form of justification in disguise." *Id*.

Defendant has not demonstrated that throughout her months-long participation in the conspiracy, she suffered from a "severe mental disease or defect" which left her unable to understand her own actions. There is no evidence on the record she could not discern right from wrong. Accordingly, she never had a formal insanity defense. To support her mental incompetence claims, Defendant has attached notes from a single mental-health related visit prior to her incarceration.[6] The appointment took place on December 21, 2016—well into her involvement in the conspiracy—and reflects diagnoses for attention deficit hyperactivity disorder ("ADHD") and depressive disorder. (ECF No. 104-3 at 4.) Dr. Aruna Bapat's clinical notes affirm Defendant's high stress levels and note some depressive symptoms, such as inability to get up in the morning and desire to try antidepressant medication. (*Id*.) Yet, Dr. Bapat's notes do not discuss the severity of Defendant's depression nor any resulting incompetence or inability to discern right from wrong. Importantly, the notes lack any reference to Defendant's relationship or any form of relationship abuse. Instead, they indicate Defendant's eating and sleeping habits were normal, and "she [was] doing well in her classes." (*Id*.) Defendant's "chief complaint" prompting

---

[6] While Defendant has supplied records from post-incarceration mental health visits which reflect a stated history of emotional abuse, physical abuse, suicide attempts, and substance abuse, (ECF No. 104-3 at 1), these visits took place after Defendant's conviction. They could not have put Counsel on notice that Defendant had a viable insanity defense.

the visit was to refill her ADHD medication.  (*Id*.)  This record does not reflect the severe level of mental impairment required to sustain an insanity defense.   On the contrary, it expresses Defendant's ability to make reasoned decisions with her doctor regarding her mental health.   Even crediting Defendant's statements regarding her suicide attempt before her arrest and severe depression stemming from her controlling and abusive relationship, (*see, e.g.*, ECF No. 104-2 at 2-3), these facts do not, without more, support an inference that she could not discern "the nature and quality or the wrongfulness" of her actions.   Indeed, Defendant's deep knowledge of nearly every part of the conspiracy, alongside her admission that she knew "what she and Khleborod were doing was illegal," (ECF No. 126 at 4 (quoting ECF No. 125 at 4)), reveals she understood *both* the nature and wrongfulness of her actions.  (ECF No. 123 at 4 (quoting the Government's sealed report of Defendant's interview).)  Taken in the light most favorable to Defendant, the record does not support a finding that Counsel was or should have been "aware of the possibility that [his] client was legally insane."  *Alexander*, No. 2:19CR5, 2020 WL 3397753, at *4.   Accordingly, Counsel's actions do not rise to the level of professional incompetence, and cannot sustain Defendant's ineffectiveness of counsel claim.

Likewise, Defendant has not shown that a mental defect affected her ability to form the required specific intent to participate in the conspiracy.  (*See* ECF No. 141 at 9 (arguing she did not "have the mental awareness to 'knowingly' or 'voluntarily' join the conspiracy").)  Defendant was convicted of "conspiring, under 21 U.S.C. § 846, to violate the drug trafficking prohibitions" of 21 U.S.C. § 841(a) & (b)(1)(C).  (ECF No. 70 at 1-2); *United States v. Ali*, 735 F.3d 176, 186 (4th Cir. 2013).  The *mens rea* element of § 846 derives from its underlying offense, here, § 841(a) & (b)(1)(C).  *Id.* at 186.  Section 841(a)(1) makes it unlawful for a person "knowingly or intentionally . . . to distribute . . . a controlled substance" or "knowingly or intentionally to . . .

15

possess with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1).  To sustain

a conviction, therefore, the government would have to demonstrate that Defendant had "the

specific intent to distribute . . . or to possess with intent to distribute a controlled substance.  *Ali*,

735 F.3d at 186.

In light of *Worrell*, a defendant can "use the results of a [mental exam] to negate the specific

intent element of the alleged conspiracy, but only if those results [are] relevant to her specific

intent as opposed to an affirmative defense."  *United States v. Milan*, No. 1:13CR60-1, 2014 WL

6673486, at *3 (N.D. W. Va. Nov. 24, 2014).

Defendant claims that her mental defects prevented her from forming the specific intent

to distribute illicit drugs.  Assessing this claim in light of her ineffective assistance argument, the

court must determine whether Counsel's advice to plead guilty (and fail to investigate Defendant's

specific intent) was unprofessional because a diminished capacity argument would have prevented

the Government from proving an element of the offense.  But here, there is no evidence that a

mental exam would have revealed evidence of incompetence undermining Defendant's specific

intent.  Instead, Defendant's testimony shows both awareness and understanding of the intricate

details of Khleborod's drug trafficking operation, including her role in buying stealth materials

and shipping parcels through the mail.  (ECF No. 122 at 18-19.)  Defendant knew about the

accounts, the drugs, and the buyers in various states.  (*Id*. at 19.)  She knew how Khleborod cashed

his bitcoin proceeds, using them for lavish purchases, including a couple's vacation in Barbados.

(ECF No. 81 at 4.)  Her purposeful actions to conceal the drugs and ship them to the buyers, paired

with her detailed knowledge of the operation, show, at a minimum, an intent to distribute a

controlled substance and participate in the conspiracy.  Indeed, her involvement reaches far beyond

the essential "slight connection between a defendant and the conspiracy to support conviction."

*United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010) (explaining a § 846 conspiracy conviction need not show the defendant "knew all [] co-conspirators or all of the details of the conspiracy," and can be sustained even if the defendant "played only a minor role in the conspiracy") (citing *United States v. Burgos*, 94 F.3d 849, 861 (4th Cir. 1996) (*en banc*)).  Counsel cannot have violated professional norms by advising defendant to plead guilty with nonexistent evidence of diminished capacity that could reasonably have undermined her specific intent.

Neither Defendant's insanity claim nor her challenge of the specific intent element of her conspiracy conviction find support in the facts.  She cannot overcome *Strickland's* "strong presumption that Counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  Counsel did not ignore evidence of Defendant's abusive relationship and suffering due to Khleborod's threats and manipulation.  On the contrary, he centered this argument in the sentencing memorandum and hearing.  Counsel also chose to focus on Defendant's limited role in the conspiracy compared to that of Khleborod, her willingness to testify against her former romantic partner, and the tremendous support of her community on her behalf.  (See ECF No. 122 at 35-38; ECF No. 81 at 7.)  His representation reflected reasonable strategic decisions and was, by all accounts, successful, earning Defendant a sentence below the mandatory minimum.  Counsel's performance was not unreasonable merely because he did not pursue an insanity defense.[7]

---

[7] Discussing her alleged mental incompetence, Defendant makes numerous references to voluntary and involuntary intoxication throughout her relationship with Khleborod and involvement in the conspiracy.  (*See, e.g.,* ECF No. 141 at 10, 11; ECF No. 81 at 4 (Counsel's explanation that Defendant's "judgment became more clouded by Xanax abuse").)  She claims he drugged her with Xanax, Fentanyl, and other substances, and that as a result, she became addicted.  (ECF Nos. 104-2 at 2; 141 at 2.)  Yet, for the reasons laid out in this section, Defendant cannot challenge her guilty plea based on Counsel's alleged failure to investigate a diminished capacity defense due to intoxication.  The record does not suggest Defendant had a viable intoxication defense: as discussed in the analysis of Defendant's alleged insanity defense, the facts show Defendant knew

### 2. *Duress*

Defendant also argues that she received ineffective assistance when Counsel failed to investigate a battered woman's syndrome defense and obtain expert testimony regarding Defendant's history as a battered partner. She claims Counsel's omissions caused her to plead guilty without knowing a valid defense was available. (ECF Nos. 141 at 13-14; 104-2 at 4.) Defendant contends she participated in the conspiracy under duress and coercion exerted by Khleborod throughout their relationship. (ECF No. 141 at 13.)

Battered woman's syndrome refers to a psychological condition arising from a spouse's "repeated and violent beatings and the wife's dependency—economic and emotional—that make it practically impossible for her to leave." *Moran v. Ohio*, 469 U.S. 948, 950 (1984) (Brennan, J., dissenting).[8] Generally, the condition is invoked in self-defense cases where "a traditional self-defense theory may seem to fit the situation only imperfectly." *Id.* (citations omitted). Battered woman's syndrome is a justification defense. Unlike insanity or intoxication, it "does not excuse criminal conduct because a defendant was incapable of formulating a requisite mental state." *United States v. Williams*, 163 F.R.D. 249, 250 (E.D.N.C. 1995) (quoting *United States v. Bell*,

---

about Khleborod's drug trade and took intentional actions to support his operation. The record does not indicate Defendant suffered from any kind of drug-induced psychosis or delusions each time she took a parcel to the mail or purchased stealth materials for concealment. And Defendant does not argue to the contrary in her motion. *See, e.g., Savino v. Murray*, 82 F.3d 593, 602 (4th Cir. 1996) (defendant intoxicated with cocaine during murder could not show ineffective assistance because record did not point to a lack of premeditation—his "logical, deliberate" actions showed "no inability to know right from wrong"). Defendant has not established deficiency in Counsel's representation on this ground.

[8] While there is no single accepted definition of the syndrome, courts have stated that "'battered woman syndrome' generally refers to common characteristics appearing in women who are physically and psychologically abused by their mates." *Fennell v. Goolsby*, 630 F. Supp. 451, 456 (E.D. Pa. 1985).

855 F. Supp. 239, 240 (N.D. Ill. 1994)).  "Rather, it presumes such mental state to exist but offers a legally recognizable justification for the conduct."  *Id.*

Defendant invokes battered woman's syndrome claiming her guilty plea is tainted by Counsel's failure to inform her of a viable duress defense.  But it is unlikely such a defense was available to her because she has not presented evidence of ongoing physical violence in her relationship with Khleborod.  To prove justification through duress, a defendant must show that "(1) she acted under an immediate threat of serious bodily injury; (2) she had a well-grounded belief that the threat would be carried out; and (3) she had no reasonable opportunity to avoid violating the law and the threatened harm."  *United States v. Smith*, 113 F. Supp. 2d 879, 909 (E.D. Va. 1999) (citing *United States v. King,* 879 F.2d 137, 138-139 (4th Cir. 1989)).  While the Fourth Circuit has not squarely considered the issue, other circuit courts have considered evidence and expert testimony regarding battered woman's syndrome to support a defense of duress or coercion. *See, e.g., United States v. Nwoye*, 824 F.3d 1129, 1138 (D.C. Cir. 2016) (expert testimony on battered woman's syndrome "can be relevant to both prongs of the duress defense"—establishing whether a defendant acted reasonably under the circumstances based on their perception of the imminence of threatened harm and the existence of reasonable alternatives, such as leaving the abusive relationship); *Dando v. Yukins*, 461 F.3d 791, 802 (6th Cir. 2006) ("With help from an expert on Battered Woman's Syndrome, [the defendant] could have introduced evidence of all of the elements of a duress defense" including whether her partner's threats "in fact caused her to fear death or serious bodily harm" at the time of her actions, and "to explain why [she] may have felt unable to escape the situation."); *United States v. Lopez*, 913 F.3d 807, 822 (9th Cir. 2019) (concluding that "expert testimony on [battered woman's syndrome] is relevant to supporting a defendant's argument that she had a well-grounded fear that she would be harmed if she failed to

commit the illegal act demanded of her and that she had no reasonable opportunity to avoid committing the crime").

Here, Defendant's participation in the conspiracy took place over multiple months and involved a series of acts to conceal, package, and ship drugs to buyers across the country. To date, she has not offered evidence that she was acting under fear of *imminent* and serious harm when violating federal laws. Instead, her argument implies a "generalized fear of serious bodily harm if she did not commit certain offenses" as a result of Khleborod's abuse which is traditionally insufficient to establish duress. *Smith*, 113 F. Supp. 2d at 909 (citing *United States v. Sixty Acres in Etowah County*, 930 F.2d 857, 860-61 (11th Cir. 1991)).

Defendant also failed to show evidence of any physical abuse or "battering" in her relationship, despite numerous opportunities to raise the issue during the proceedings, a nearly uniformly required component of battered woman's syndrome.[9] In the absence of caselaw supporting a viable battered woman's syndrome defense in cases involving only emotional abuse,

---

[9] Recognizing a recurring pattern of abuse in battered spouse cases, courts describe "three recurrent phases of abuse: a tension-building stage, characterized by minor abuse; an acute battering stage, characterized by uncontrollable explosions of brutal violence; and a loving respite stage, characterized by calm and loving behavior of the batterer, coupled with pleas for forgiveness." *Id.*; *see also Tourlakis v. Morris*, 738 F. Supp. 1128, 1134 (S.D. Ohio 1990). Thus, some showing of physical violence is typically required. *See, e.g., Walker v. Kernan*, No. C-95-0101 SI, 1997 WL 168557, at *7 (N.D. Cal. Mar. 27, 1997), *aff'd*, 156 F.3d 1241 (9th Cir. 1998) (finding that "emotional control" and "threats to deny the [defendant spouse] custody of his children" were insufficient to render counsel's failure to present evidence of battered woman's syndrome unconstitutional, because the case was distinguishable from those involving substantial physical violence). Some courts invoke a broader definition of battered woman syndrome encompassing physical *or* emotional abuse by a spouse or partner, *see Santiago v. Riley,* No. 4:16-CV-3512, 2017 WL 4286228, at *7 (D.S.C. Sept. 26, 2017), but this court is unaware of any federal case where a battered woman's defense was successfully raised in the absence of physical abuse or violence. *See also, Tyler v. Kendell*, No. CA 8:09-377-CMC-BHH, 2009 WL 5216892, at *17 (D.S.C. Dec. 29, 2009) (rejecting defendant's ineffective assistance claim for failure to bring battered woman's defense because the circumstances did not show she "was the victim of continuing abuse that made her believe she was in imminent danger, that the victim was more powerful than her, or that she believed she was helpless").

Counsel's strategic choice to forgo the defense did not amount to professional error. Defendant argues she felt trapped in her relationship because she "had no money to leave Khleborod." (ECF No. 141 at 3.) But this belies the findings of her Presentence Investigation Report, which determined she lived with her parents at the time of the offense and even contributed financially towards household expenses, and to which Defendant offered no objections. (ECF No. 122 at 4.) Khleborod's "worst threat," Defendant elaborates, came when he sent packages to her family's home unbeknownst to her" and without her permission. (ECF No. 141 at 2.) Yet, Defendant contradicted this assertion in her statement to investigators, where she explained in detail how the packages would be addressed to and signed for by her mother, and how she advised her mother to put the packages aside. (ECF No. 126 at 3 (citing ECF No. 125 at 4).) In the same statement, she mentioned nothing about violent threats or physical abuse, saying only that Khleborod wouldn't continue to date her if she did not accept and aid his drug dealing operation. (ECF No. 126 at 2 (citing ECF No. 125 at 2).) Defendant's Presentence Investigation Report also made no mention of any history of domestic abuse of family violence. When the court asked her whether she had an opportunity to review the PSR with counsel, Defendant answered in the affirmative. (ECF No. 122 at 3.) She also stated she understood "no objections [had been] lodged with the report." (*Id.*)

Counsel's sentencing memorandum, examining at length Khleborod's manipulation and control over Defendant, questioned why Defendant would participate in an operation from which "[s]he received little, if any benefit." (ECF No. 81 at 4.) Yet, Counsel was careful to limit his discussion of abuse in the relationship to Khleborod's emotional manipulation and control. Explaining how "[d]omestic abuse is often illustrated by physical attacks, though that is just a fraction of what actual domestic abuse is," Counsel argued how this ostensibly non-violent relationship was still abusive at its core. (*Id.* at 5.) Counsel cited Khleborod's repeated, and

ultimately real, threats to harm himself and blame Defendant for his actions as evidence of his manipulative behavior. (*Id*. at 5-6.) At the sentencing hearing, Counsel again emphasized the need to look beyond physical abuse in recognizing domestic violence:

> "[I]t is simple for us to look at physical abuse and say, well, that is what we see. But the signs that Mr. Khleborod exhibited, the friends that I have spoken to, the family members I have spoken to, the things he did are right in line with an abuser."

(ECF No. 122 at 34-35.) Counsel would not have ignored facts supporting physical domestic violence in his detailed mitigation argument—except if such facts did not exist. It is far more likely that the facts known to Counsel during the representation did not point to physical domestic violence, and therefore, could not support a battered woman's syndrome defense.

Likewise, none of the letters submitted on behalf of Defendant, nor the witnesses who testified to her character at sentencing, mentioned any type of abuse or violence in her past. Defendant herself, in her statement to the court, expressed remorse for "the mistake of holding on to someone who was so selfish to [her]" and who "caused this to himself at the end [*sic*]," without any mention of physical violence or beatings in his hands. (ECF No. 122 at 49.) Before announcing its sentence, the court reiterated the "mental abuse" inflicted by Khleborod as a mitigating factor—but explicitly stated that "no evidence of physical abuse" existed. (ECF No. 122 at 54 ("[T]here is still concern, obviously, that you had some certain guidance under Mr. Khleborod, there was mental abuse, no evidence of physical abuse, you were exposed to the nature of criminal activity based on threats to your family with respect to those issues that had led to the asylum of your family coming into the United States.").) Neither Defendant nor Counsel challenged the court's impression on this ground. Even now, Defendant puts forth only generic statements that her relationship with Khleborod was physically abusive—failing, for example, to

identify specific incidents of abuse, threats, or violence against her.[10] (*See, e.g.*, ECF No. 141 at 3 ("If she did not do what Khleborod forced her to do, he would be physically abusive and threatened her family.") At bottom, nothing on the record indicates Defendant experienced battered woman's syndrome as a result of Khleborod's abuse. Consequently, a duress defense was likely unavailable to her. Counsel's alleged failure to investigate and inform Defendant of a defense unsupported by the record and the caselaw is not ineffective assistance. Defendant's duress-based argument is therefore unavailing.

## B. Competency at Plea and Sentencing Hearings

Defendant also argues she was incompetent during her guilty plea and sentencing hearings, and that Counsel's performance was deficient because he failed to request a competency evaluation. (ECF Nos. 104 at 5; 104-2 at 6.) This collateral challenge has not been waived because it calls into question the knowing and voluntary nature of Defendant's plea. Legal competence requires a "sufficient present ability to consult with [one's] lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against one." *United States v. Torrez*, 869 F.3d 291, 322 (4th Cir. 2017) (quoting *Dusky v. United States,* 362 U.S. 402, 402 (1960)). This principle stems from the Constitution. *Pate v. Robinson*, 383 U.S. 375, 385 (1966) (holding the court's failure to inquire into the defendant's mental capacity deprived him "of his constitutional right to a fair trial"). In *Godinez v. Moran*, 509 U.S. 389, 398-99 (1993), the Supreme Court clarified that the *Dusky* standard for competence applies equally to

---

[10] Medical records preceding Defendant's incarceration and produced alongside this Motion, as discussed *supra*, do not make any reference to domestic violence. Post-incarceration records listing Defendant's history of domestic violence were created only based on Defendant's own statements to prison healthcare officials, and also do not discuss specific instances of relationship violence. At any rate, such records were unavailable at the time of the representation and could not have put Counsel on notice of physical abuse.

defendants who plead guilty instead of proceeding to trial. Legally incompetent defendants are protected by statute from convictions violating their substantive and procedural due process rights. *See* 18 U.S.C. § 4244 (addressing a defendant's competence to be sentenced, and requiring the district court, "at any time prior to the sentencing of the defendant . . . [to] order . . . a hearing . . . if it is of the opinion that there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect . . ."); *see also Walton v. Angelone*, 321 F.3d 442, 459 (4th Cir. 2003) ("Competency claims can raise issues of both procedural and substantive due process."). To establish ineffective assistance, however, a defendant need only show that if "counsel [had] taken reasonable steps to investigate [her competence], a hearing could have been held on the issue of . . . competency, and the *Dusky* standard would have been applied at that time." *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990). Attorneys have an affirmative duty "to make further inquiry regarding [a] defendant's mental condition" if "the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt" of her mental competence. *Mann v. United States*, 66 F. Supp. 3d 728, 736 (E.D. Va. 2014) (quoting *Wood v. Zahradnick*, 430 F. Supp. 107, 111 (E.D. Va. 1977), *aff'd*, 578 F.2d 980 (4th Cir.1978)) (internal quotation marks omitted). Naturally, this duty "does not mandate the exploration of the issues of sanity and/or competency in every instance." *Wood*, 430 F. Supp. at 111.

Defendant argues that Counsel should have investigated her history of depression, suicidal behavior, and PTSD, which rendered her incompetent "during the period [between] August[] 2017 through May 11, 2018." (ECF No. 141 at 4.) She cites several suicide attempts which occurred in December 2016 or January 2017 before her indictment (ECF Now. 104-2 at 2; 141 at 2), and November 2017, after she had entered her guilty plea but before she was sentenced by the court. (ECF Nos. 104-2 at 2; 141 at 11.) These incidents, she claims, demonstrate her incapacity to plea

and be sentenced.  (ECF No. 141 at 10, 12.)  Defendant also refers to Counsel's statements regarding Khleborod's abusive behavior towards Defendant and the court's reference to the "effect of [Khleborod] on [Defendant]" during sentencing, asserting these statements should have put both Counsel and the court on notice that a competency hearing was needed.  (ECF No. 104-2 at 6.)

An examination of the record, however, demonstrates there was never any genuine doubt as to Defendant's competence to enter a guilty plea and be duly sentenced.  Accordingly, Counsel's failure to raise this claim during the proceedings did not fall below an objective standard of reasonableness under the first *Strickland* prong.  First, the statements by Counsel and the court relating to Khleborod's control over Defendant do not unequivocally raise reasonable doubts concerning Defendant's mental competence.  The tragic circumstances surrounding Defendant's abusive relationship, do not, without more, negate her ability to consult with her lawyer and understand the proceedings against her.  She must present something more to challenge her actual ability to understand and participate in the proceedings against her.  Defendant has not done so here.  Instead, her cogent demeanor during her interview with federal investigators, her comprehensive knowledge of nearly every component of the conspiracy, her willingness to cooperate against her former partner, her ability to convey the circumstances of her relationship and childhood difficulties to Counsel, all point to a sophisticated ability to make reasonable choices on her own behalf.  These facts show Defendant recognized why charges were brought against her, effectively coordinated with counsel to participate in her representation, and accepted responsibility for her conduct before the court.  Defendant herself admits as much.  (*See* ECF No. 141 at 8-9 (arguing that at the time she gave her statement, "she was no longer on drugs . . . so her mental state was much different than when she was taking . . . drugs and under Khleborod's control," and that "her intelligence is not in question").)  These statements, presented to explain

25

her ability to provide a cogent statement to investigators, acknowledge that she was, at a minimum, able to answer questions and acknowledge the illegality of her actions. (*Id*. at 3 ("It is true that **two months after her arrest** (after going through detox[)], Barrero stated she knew what Khleborod was doing was illegal.") (emphasis original).) These admissions fail to establish Counsel had reasonable notice of Defendant's mental incompetence and an affirmative duty to obtain a competency hearing.

Likewise, both the court's examination of Defendant during her plea hearing and Defendant's address to the court at sentencing suggest her competence at each step of the proceedings. Before finding her guilty plea knowing and voluntary, the court carefully questioned Defendant during its Rule 11 colloquy, asking about Counsel's representation, Defendant's understanding of the facts of the case, and her rights and waivers under the plea agreement. Neither Defendant nor Counsel argued she was incompetent. Instead, Defendant gave direct and cogent answers to the court, demonstrated an understanding of the indictment and plea agreement, and reaffirmed her willingness to plead guilty. During sentencing, Defendant beseeched the court for mercy, grieving the consequences of her actions. (ECF No. 122 at 49.) She stressed that "nothing could replace" A.C. and M.L., but emphasized her accountability, remorse, and desire to do better as a "different," "stronger" person. (*Id*. at 49-50.) She expressed her hope to "encourage other people to take the right decisions in their life and stand up for themselves." (*Id*. at 49.) She requested another chance to "make amends." (*Id*. at 50.) Such statements are not lightly made—they carry the weight of contrition and demonstrate acceptance that her actions hurt not only her, but the community standing by her side. They reflect a profound understanding of her choices and refute her retroactive claims of incompetence.

Defendant's past diagnoses of depression and prior suicide attempts are also insufficient to establish incompetence. Courts routinely find defendants suffering from depression and related mental conditions competent to stand trial and face sentencing. *See, e.g., Cordero-Torres v. United States*, No. 1:15-CR-00260, 2017 WL 3471427, at *2 (E.D. Va. Aug. 11, 2017) (noting petitioner's diagnoses of "depression and anxiety along with the medications he uses to treat the illnesses . . . alone do not suggest incompetence"); *United States v. Jones*, 221 F.3d 1339, 2000 WL 975170 (7th Cir. 2000) (unpublished disposition) ("We have held that a history of depression controlled by use of Prozac does not constitute reasonable cause for a competency hearing" and referring to depression "as a 'mild psychiatric disturbance that afflicts a substantial fraction of the population'") (quoting *United States v. Grimes*, 173 F.3d 634, 636 (7th Cir. 1999)). Likewise, "a defendant is not incompetent based solely on suicidal ideations or mental illness or disability." *United States v. Collins*, 834 Fed. App'x 537, 541 (11th Cir. 2020) (holding the district court acted within its discretion by accepting the defendant's affirmations of competence despite his suicide attempt the morning before he entered his guilty plea, because the defendant evidently understood the charges against him and the consequences of his guilty plea); *United States v. Reyes*, 94 Fed. App'x 228, 229-30 (5th Cir. 2004) (affirming the district court's decision to proceed with sentencing despite defendant's "severe depression" and suicide attempt three years prior, because there was no evidence of defendant's "history of irrational behavior" or "prior medical opinions regarding competency"); *cf. Drope v. Missouri*, 420 U.S. 162 (1975).[11] Defendant's first suicide

---

[11] *Drope's* record is distinguishable from this case. There, the Supreme Court determined that a defendant's suicide attempt during trial signaled incompetence and warranted a hearing or continuance of proceedings. *Drope*, 420 U.S. at 180. But that conclusion required consideration of the entire record in aggregate—not the suicide attempt alone. *Id*. at 179-180. The Court weighed a variety of factors, including testimony from the defendant's wife, information regarding the defendant's mental health available before the proceedings, and the fact that the attempt occurred *during the trial*. *Id*. at 180. The Court noted also that the defendant's absence from the

attempt, which she contends took place in December 2016, is not documented on the record. Indeed, Dr. Bapat's notes from an appointment the same month make no mention of suicide at all, reflecting instead Defendant's rational articulation of her symptoms, good performance in her classes, and willingness to try medication. (ECF No. 104-3 at 4.) Defendant claims she attempted to take her life again in November 2017, several days after Khleborod's suicide in custody.[12] She asserts this history left her incompetent for sentencing on May 11, 2018. But records from a June 20, 2018, visit with a mental health practitioner in prison reveal Defendant was "alert and oriented," with "cooperative" behavior, "appropriate and content" mood, and importantly, "goal directed" thought process. (ECF No. 104-3 at 6.) Though the form notes a past history of suicide attempts, it states the most recent attempt took place more than two years prior, and that Defendant

---

remainder of the proceedings made it impossible for the trial judge and defense counsel "to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him." *Id.* at 181. Still, the Court emphasized that "the empirical relationship between mental illness and suicide or suicide attempts is uncertain and that a suicide attempt need not always signal an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion." *Id.* at 181 n. 16. While Defendant has presented evidence of depression, PTSD, and attempted suicide before her sentencing hearing in this case, her suicide attempt took place several months before sentencing, and her demeanor and statements at sentencing were not only observable to the court, but demonstrated she was lucid, coherent, and deeply regretful of her actions. The witnesses speaking on her behalf, including her father and brother, did not mention her incompetence. The record, considered in aggregate, simply does not reflect the dire circumstances of *Drope*.

[12] Defendant's Response to the Government's Motion for Summary Judgment, mentions, for the first time, four prior suicide attempts, rather than the two instances cited in her § 2255 Motion. Her statement on this ground is inconsistent and Defendant has not presented evidence of the additional suicide attempts aside from a self-serving affidavit. (ECF No. 141-1 at 1.) Defendant's argument that she attempted suicide again shortly before her sentencing on May 11, 2018, is further contradicted by her medical records: A "Prisoner in Transit Medical Summary" form, created on May 31, 2018, clears Defendant for travel and a box indicating whether the prisoner was held under "suicide watch/psychiatric decompensation within [the] past month" remains unchecked. (ECF No. 104-3 at 5.) Records from a mental health visit on June 20, 2018, just over a month after sentencing, similarly note her most recent suicide attempt took place more than two years ago. (*Id.* at 6.)

has no current suicidal ideation.  (*Id.*)  If a suicide attempt months before affected her competence at sentencing, these effects could surely not have dissipated by June 20, 2018.  In sum, Defendant has not presented *any* medical findings that explicitly or implicitly conclude she was incompetent during the proceedings.  While the court does not minimize the seriousness of Defendant's depression and suicidal behavior, it must nonetheless consider her claims together with the entire record, which confirms Defendant's ability to understand the proceedings and cooperate with counsel on her defense.  A competency hearing was not warranted without Counsel's notice of Defendant's legal incompetence.  As such, this claim must be dismissed.

### C.  Insufficiency of Evidence and Failure to Investigate

Defendant devotes a substantial portion of her § 2255 Motion to discuss the alleged insufficiency of evidence supporting her conviction.  (ECF No. 104-2 at 7-8; 141 at 15-18.)  Such arguments, however, cannot collaterally attack her valid guilty plea because they do not challenge its knowing and voluntary nature.  *See Fields*, 956 F.2d at 1294-96; *see also Siers-Hill v. United States*, 467 F. Supp. 3d 406, 415 (E.D. Va. 2020), *appeal dismissed,* No. 20-7169, 2020 WL 8472436 (4th Cir. Sept. 24, 2020), and *appeal dismissed,* No. 20-7113, 2022 WL 258487 (4th Cir. Jan. 25, 2022) ("As a guilty plea is an admission of all the elements of the charges in the indictment, a petitioner typically may not collaterally attack the plea on the grounds of insufficient evidence to prove an element of the offense.") (citation omitted).

Defendant accepted the factual basis of her guilty plea during her plea hearing—indeed, much of the factual basis presented derived from her proffered statement to federal investigators.  (ECF No. 126 at 2-4 (citing ECF No. 125).)  She attempts to overcome this barrier by recasting her argument as one for ineffective assistance, deriving from Counsel's alleged failure to investigate *her* connection to A.C. and M.L.'s deaths and H.T.'s overdose.  Counsel's "failure to

investigate or discover potentially exculpatory evidence" before advising Defendant to plead guilty may establish ineffective assistance. *Hill*, 474 U.S. at 59-60. The key question is whether the unexplored evidence "would have led counsel to change his recommendation as to the plea." *Id.* at 59. Yet, the court need not consider this argument, because it was raised for the first time in Defendant's Response to the Government's Motion for Summary Judgment (ECF No. 141), filed more than one year after her conviction and sentence were finalized in the court's judgment. Because § 2255 has an explicit one-year period of limitation, Defendant cannot raise new grounds for relief in untimely filings. *See* 28 U.S.C. § 2255(f). Even if considered, however, Defendant's ineffective assistance claim for failure to investigate lacks merit.

Defendant claims she would have rejected the plea agreement and proceeded to trial but for counsel's failure to investigate the victims' overdoses, which would have revealed other causes of death and injury. (ECF No. 141 at 20.) She does not, however, appear to challenge the fact that these victims ordered drugs from Khleborod's "PetertheGreat" account, that she and Khleborod shipped the drugs to the victims by mail, and that the victims ingested the drugs. Instead, Defendant focuses on the victims' past mental health struggles and addictions, implying that A.C. and M.L.'s deaths were caused by suicide, alcoholism, or other drugs. (ECF No. 141 at 15-17.) Yet, the factual basis presented during Defendant's plea and sentencing hearings and affirmed by Defendant refutes her claim.[13] In *Burrage v. United States*, 571 U.S. 204, 218-19 (2014), the

---

[13] Indeed, the court specifically questioned Counsel and the Government on the "death or serious injury" element of the offense during the plea hearing, to probe Defendant's specific connection to the victims who died as a result of the drugs. Noting his "extensive research" of the issue, Counsel explained that Supreme Court and Fourth Circuit precedent requires neither foreseeability of the victim's deaths nor personal involvement with the victims. Though Defendant's argument turns on whether the drugs she admittedly distributed to the victims caused their deaths, the court notes that by accepting the factual basis as presented, she conceded that the victims were customers of the conspiracy.

Supreme Court held that "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury."  To support her ineffective assistance claim, Defendant must show evidence—overlooked by Counsel due to his failure to investigate—that some substance *other than those she and Khleborod shipped to the victims* caused their deaths.  She cannot do so.

A.C. died surrounded by U-47700 she purchased from PetertheGreat and shipped in the same Veriquick pregnancy test Defendant purchased on security camera from a South Carolina Dollar Tree.  (ECF No. 122 at 7, 14.)  Her cell phone linked the U-47700 purchase directly to Khleborod and Defendant's dark web operation.  (ECF No. 126 at 18 (referencing the Government's statement during the plea hearing that internet traffic from A.C.'s cell phone helped pinpoint the account).)  Perhaps most damning for Defendant are A.C.'s autopsy results, which conclusively determined her cause of death was U-47700 toxicity.  (*Id.* at 8.)  Defendant now attempts to pull a veil over these well-established facts by alluding to A.C.'s struggles in foster care and her past addiction.  (ECF No. 104-2 at 7.)  But she can point to no evidence proving another cause of death, because no such evidence exists.  Her unfounded speculation regarding "what other drugs" were in [A.C.'s] "system the day of her death," (*id.*), warrants no serious discussion.  The toxicology report answered the only question that matters after *Burrage*: the U-47700, linked to Defendant by persuasive circumstantial evidence, caused A.C.'s death.

For M.L., too, there is abundant evidence linking his death to fentanyl derivatives shipped through the conspiracy.  (ECF No. 122 at 8-9, 17-18.)  The relevant facts were presented during Defendant's plea and sentencing hearings and within her PSR.  Notably, investigators were able

to recover papers indicating M.L. had ordered one gram of furanyl fentanyl on April 9, 2016, to the same address where he resided with his family and ultimately died. (ECF No. 122 at 18.) Although the autopsy report for M.L. referenced "mixed furanyl fentanyl and fentanyl toxicity," it does not specifically state that his death was caused by these substances. (*id.* at 9; *see also* Defendant's Presentence Investigation Report.) Still, it does not reference any other substances which could have caused his death. Defendant emphasizes a statement from M.L.'s wife indicating he was on anti-anxiety medication and had been drinking heavily the night before his death. (ECF No. 104-2 at 8.) Even if he had, however, nothing in the toxicology report indicates M.L. would have died regardless of the fentanyl and fentanyl derivatives in his system. *Burrage* makes it clear that even if multiple drugs interact to cause the victim's death, the fact that one of these substances was supplied by the defendant is sufficient to meet the causation requirement of § 841(b)(1)(C). *See United States v. Schnippel*, No. 1:09-CR-72 LMB, 2015 WL 4358052, at *5 (E.D. Va. July 14, 2015) (*Burrage* "expressly permits liability when the drug is not an independently sufficient cause of death or serious harm, so long as it is a but-for cause of the death or harm, meaning that . '. . without the incremental effect of the [drug], [the victim] would have lived.'") (quoting *Burrage*, 571 U.S. at 211). Defendant cannot present evidence that M.L. died from something other than the fentanyl she and Khleborod had supplied. At any rate, her acceptance of the facts at her plea and sentencing hearings, along with her admission that she and Khleborod shipped drugs to these victims, preclude her factual challenges on post-conviction review. (*See* ECF No. 141 at 18 ("This is not to say that Khleborod did not ship drugs to these victims. . .").) Counsel's failure to discover exculpatory evidence Defendant herself has not presented does not meet the threshold of ineffectiveness as to his professional responsibilities in representing Defendant.

Finally, "when the Government's case is strong," a § 2255 petitioner "faces a nearly insurmountable obstacle to showing that it would have been rational to go to trial." *United States v. Santiago*, 632 Fed. App'x 769, 774 (4th Cir. 2015)). And when evidence of a defendant's guilt is "overwhelming," proceeding to trial is simply not "rational under the circumstances." *United States v. Fugit*, 703 F.3d 248, 259 (4th Cir. 2012). Here, the evidence against Defendant was inescapable and supported by her own confession. She "was lucky to receive the deal" she did. *Id.* This claim, too, must be dismissed.

#### D.  Failure to Appeal

In her final argument, Defendant argues Counsel was constitutionally ineffective because he did not file a notice of appeal despite her requests to do so after the court pronounced her sentence. (ECF Nos. 141 at 14-15, 20; 141-1 at 2.) Defendant claims that Counsel advised her that "he did not feel she had any grounds for an [a]ppeal." (ECF No. 141 at 15.) Yet, Defendant has presented no evidence outside her self-serving affidavit to support this claim. The record indicates that Defendant's plea earned her a significant five-year variance from the twenty-year mandatory minimum she would have faced had she been found guilty at trial. In exchange, Defendant agreed to waive her right to appeal the sentence: a fact she knowingly and voluntarily acknowledged at her plea and sentencing hearings. Failure to uphold her end of the bargain could have led the Government to cross-appeal her below-guidelines sentence, upending an outcome in her favor. In the absence of exculpatory evidence or viable defenses, as examined in depth in the previous sections, an appeal would have been ill-advised. Still, despite the strategic realities of appealing a sentence after pleading guilty, it is well-established that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). But here, the court

need not even consider the factual question of whether Defendant provided such specific instructions to Counsel.

Neither of the three grounds for relief within Defendant's § 2255 Motion to Vacate mention Counsel's failure to file a notice of appeal: the claim appears for the first time in Defendant's Response to the Government's Motion for Summary Judgment (ECF No. 141), filed August 15, 2019. Courts will generally not permit a petitioner to raise new arguments in a reply brief. *See United States v. Ibarra-Ayon*, No. 5:13-CR-00009-1, 2015 WL 5278379, at *1 n.1 (W.D. Va. Sept. 9, 2015) (citing *Snyder v. United States*, 263 Fed. App'x 778, 779 (11th Cir. 2008); *Hull v. United States*, Nos. RWT 05–0109, RWT 06–1593, 2008 WL 4181946, at *3-4 (D. Md. Sept. 5, 2008); *Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 111 (W.D. Va. 2007), *aff'd sub nom. Equity in Athletics, Inc. v. U.S. Dep't of Educ.*, 291 Fed. App'x 517 (4th Cir. 2008). Even so, Defendant's Response is out of time. The court sentenced Defendant on May 11, 2018, and her time to appeal her sentence expired fourteen (14) days later. *See* Fed. R. App. P. 4(b)(1)(A).[14] Accordingly, Defendant's conviction became final on May 25, 2018, triggering the one-year limitations period to seek post-conviction relief through a § 2255 Motion. On August 12, 2019,

---

[14] The court twice explained Defendant's rights on appeal during sentencing, closing the hearing with the following clarification:

| The Court: | And then, Ms. Barrero, just to make sure that you understand your appeal rights, you can appeal through your attorney in accordance with your plea agreement. If not represented by an attorney, you can do so on your own, but it has to be in accordance with the time periods outlined in the relevant statutes of the Federal Rules of Criminal Procedure; do you understand that? |
|---|---|
| The Defendant: | Yes, Your Honor. |

(ECF No. 122 at 58-59; *see also id.* at 57.)

34

Defendant placed her Response in the prison mail system, establishing the filing date for any new claims she raised. *See Houston v. Lack*, 487 U.S. 266, 271 (1988). Her attempt to amend the original motion by adding the present ineffective assistance claim came nearly three months late. *See, e.g., Mustapha v. United States*, No. CRIM.A. 302CR096JRS, 2005 WL 1667682, at *7 (E.D. Va. June 10, 2005) (rejecting, under similar circumstances, the petitioner's attempt to add an ineffective assistance of counsel claim for failure to file a notice of appeal, because the claim was brought for the first time in a reply brief filed more than a year after petitioner's conviction became final).[15] Defendant did not explain or even mention her failure to include the claim in her original Motion. The information needed to raise this claim was available since Defendant's time to appeal expired, and she could have easily enclosed the claim alongside her three original grounds for relief. For that reason, Defendant's final ineffective assistance claim must also be dismissed.

## IV. CONCLUSION

After a thorough review, the court **DENIES** Defendant's § 2255 Motion to Vacate (ECF No. 104) and **GRANTS** the Government's Motion for Summary Judgment (ECF No. 126.)

## V. CERTIFICATE OF APPEALABILITY

The law governing certificates of appealability provides that:

(c)(2) A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.

---

[15] Defendant's novel ineffective assistance of counsel claim for failure to file a notice of appeal also does not, under Fed. R. Civ. P. 15(c), "relate back" to the grounds for relief articulated in her original § 2255 Motion. Rule 15(c) permits amendment to add new claims or defenses which "arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Fed. R. Civ. P. 15(c)(2). An "occurrence," for the purposes of Rule 15(c), cannot be framed so generally as to encompass the entirety of the trial and penalty phase of the criminal case. *United States v. Pittman*, 209 F.3d 314, 318 (4th Cir. 2000). Here, Defendant's failure to appeal claim arises out of "wholly different conduct" by Counsel, separated from Defendant's original ineffective assistance claims by "both time and type." *Id.* (citing *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999)).

> (c)(3) The certificate of appealability . . . shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c).  A prisoner satisfies this standard by demonstrating that reasonable jurists would find this court's assessment of his constitutional claims is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable.  *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001).  In this case, the legal standard for the issuance of a certificate of appealability has not been met.

**IT IS SO ORDERED.**

J. Michelle Childs
United States District Judge

August 1, 2022
Columbia, South Carolina